**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

In re
**MIDNIGHT PASS INCORPORATED,**                    Chapter 11
                                                   Case No. 09-14300-JNF
        Debtor
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

**KITTYWALK SYSTEMS, INC,**
**JEFF KING, and LISE KING**,
        Plaintiffs
v.                                                 Adv. P. No. 09-1179
**MIDNIGHT PASS INCORPORATED,**
**BARRET DISTRIBUTION CENTERS, INC.,**
**BRADFORD D. WHITE**
**JULIE ANNE WHITE, and**
**SAN JOSE DISTRIBUTION SERVICES, INC.**,
        Defendants

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

<div align="center">

**MEMORANDUM**

</div>

## I. INTRODUCTION

The matter before the Court is the "Emergency Motion of Bradford D. White, Julie

Anne White and Debtor Midnight Pass Inc. to Request Short Order Notice Motion for

Contempt of Court for Failure to Obey Court Order and Violation of This Court Order

dated 6/17/09 for Turn Over of Property" [sic] (the "Contempt Motion").  Bradford D.

White ("Mr. White"), the principal of the Chapter 11 debtor, Midnight Pass Incorporated

(the "Debtor" or "Midnight Pass"), filed the Contempt Motion, *pro se*, seeking injunctive

relief, a finding of contempt and sanctions against the plaintiffs in this adversary

<div align="center">

1

</div>

proceeding, namely, Jeff King ("Mr. King"), Lise King ("Mrs. King") (jointly, the "Kings"),
and their company, Kittywalk Systems, Inc., ("Kittywalk").

In his Contempt Motion, Mr. White contended that Kittywalk and the Kings
violated: 1) the Amended Order, dated May 11, 2009, issued by the United States District
Court for the District of Massachusetts, Tauro, D. J., in Civil Action No. 08-mc-10027 (the
"District Court Order"); 2) this Court's Order dated May 18, 2009 entered in the Debtor's
bankruptcy case (the "First Turnover Order"); and 3) this Court's Order dated June 17, 2009
entered in this adversary proceeding (the "Second Turnover Order")(collectively, the
"Orders").  All of the Orders relate to the prepetition seizure of the Debtor's property, as
well as the personal property of Mr. White and his wife, Julie Anne White (jointly, the
"Whites"), by Kittywalk and the Kings on May 12, 2009.  The seizure of the Debtor's
property was authorized by the U.S. District Court for the District of Massachusetts in an
enforcement action emanating from a judgment originally issued by the United States
District Court for the Eastern District of New York.  Following the Debtor's bankruptcy
filing, the U.S. District Court for the District of Massachusetts, Tauro, D.J., transferred that
enforcement action to this Court which is now the instant adversary proceeding.

Mr. White seeks an award of sanctions against Kittywalk and the Kings for their
alleged contempt of the Orders, as well as a return of the Whites' personalty which he
alleged in his Contempt Motion was taken unlawfully during the seizure.  The filing of the
Contempt Motion by Mr. White initiated a contested matter in this Court.  *See* Fed. R.
Bankr. P. 9020 which provides that Fed. R. Bankr. P. 9014 governs motions for orders of

2

contempt in bankruptcy cases.

This Court conducted an evidentiary hearing on the Contempt Motion on June 22, 2009, at which seven exhibits were entered into evidence and six witnesses testified. Although the Debtor did not file the Contempt Motion, its counsel appeared and fully participated at the evidentiary hearing and examined witnesses. The allegations made by Mr. White in the Contempt Motion involve multiple disputes including those between the Debtor and its creditor, Kittywalk, as well as between Mr. White and Kittywalk and its agents, the Kings.

The Bankruptcy Court is a court of limited jurisdiction, and while it has jurisdiction over disputes between the Debtor and its creditors, it does not have jurisdiction over third party disputes such as a dispute between the principal of the Debtor and the principals of the Debtor's creditor, Kittywalk, as discussed below.  Nevertheless, in light of the U.S. District Court's transfer of this adversary proceeding, this Court conducted the evidentiary hearing on an emergency basis to determine whether its orders and those of the U.S. District Court were violated and, if so, whether any violations affected the Debtor, its assets or its ability to reorganize.

## II. PROCEDURAL BACKGROUND

The Debtor operates a business specializing in the sale of gifts and accessories for pets, home, office, and travel.  On December 31, 2005, the Kings and Kittywalk commenced a civil action against the Debtor, the Whites and others in the United States District Court

for the Eastern District of New York. On January 11, 2008, following a trial, that district court entered a judgment in favor of Kittywalk against the Debtor in the amount of $364,895.38, plus interest (the "Judgment").[1]

Less than one month after the entry of the Judgment, on February 7, 2008, Kittywalk and the Kings caused the Judgment to be certified and registered in the United States District Court for the District of Massachusetts (the "District Court Action"). Kittywalk also moved for the issuance of a Writ of Execution.

Following the certification and registration of the Judgment, the parties engaged in settlement negotiations and entered into a Settlement Agreement on March 3, 2008 pursuant to which the Debtor made some payments to Kittywalk on account of the Judgment. The Debtor subsequently defaulted on the terms of the Settlement Agreement. On May 1, 2009, Kittywalk filed "Plaintiff's Post-Judgment Ex-Parte Motion to Seize and Impound the Goods, Chattels and Personalty of the Defendant Midnight Pass Incorporated" with the U.S. District Court for the District of Massachusetts seeking an order directing the United States Marshals Service "to seize and deliver into the hands of the Keeper[2] . . . all of the . . . [ Debtor's] . . . goods, effects, chattles, tools, machinery, equipment, furniture, fixtures, inventory, stock-in-trade, intellectual property rights (including domain registrations, copyrights, trademarks and patents), client records and

---

[1] The Judgment was issued against the Debtor only in favor of Kittywalk. Neither of the Kings are judgment creditors of the Debtor or the Whites.

[2] Kittywalk designated the Keeper as Barrett Distribution Centers, Inc., in "Plaintiff's Ex-Parte Motion to Appoint a Keeper."

business files (whether electronically stored or otherwise), chooses-in-action [sic], insurance

proceeds, claims and other personal property as they may find at . . . 149 Old Main Street,

Marshfield Mills [sic], MA 02051." Ten days later, on May 11, 2009, the U.S. District Court

Judge Tauro entered the District Court Order, which provided in relevant part:

> *The Court . . . hereby orders the United States Marshals Service, or its several
> deputies, to seize and impound* all the incoming business receipts, and/or
> credits (including cash, credit card receipts/disbursements and/or checks
> drawn to its order), goods, effects, chattels, tools, machinery, equipment,
> furniture, fixtures, inventory, stock-in-trade, intellectual property rights
> (including domain registrations, copyrights, trademarks and patents), client
> records and business files (whether electronically stored or otherwise),
> chooses-in-action, insurance proceeds, claims, and all other personal
> property of the Defendant, Midnight Pass Incorporated[. . .] up to the
> approximate value of $475,000.00, *and to deliver the said personalty, excluding
> all incoming business receipts and/or credits (i.e., cash, credit card
> receipts/disbursements and/or checks) to the Keeper, Barrett Warehouse, appointed
> herewith, or to such other secure third party location as is designated by Plaintiff,
> who shall thereafter hold the same until further order of this Court.* Said incoming
> business receipts and/or credits shall be retained in the custody of the
> United States Marshals Service, who shall thereafter account to Kitty Walk
> Systems, Inc. [sic] for the same.

(emphasis added).

Pursuant to the District Court Order, on the morning of May 12, 2009, the Kings,

members of the United States Marshals Service and the King's agent, F.B. Rich Moving

Company ("F.B. Rich"), entered the premises located at 149 Old Main Street, Marshfield

Hills, Massachusetts (the "Premises") and seized and removed multiple items of property.

The Premises served as the Whites' personal residence, as well as the business offices of the

Debtor and the Whites' other businesses. At the time of the seizure, the Whites were away

5

from the Premises.

Later the same day, the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.  Approximately two weeks later, it filed an Application to Employ Stephen E. Shamban as counsel.  The Court granted the Application on June 22, 2009.

On May 14, 2009, the Debtor filed a "Motion for Turnover of Property" (the "Debtor's Turnover Motion") and a request for an emergency hearing in the main case.  It alleged that Kittywalk and the United States Marshals Service seized and removed both the Debtor's property and the Whites' personal and other business property related to entities other than the Debtor from the Premises.  The Debtor sought turnover of its property pursuant to 11 U.S.C. § 542, as well as a return of the Whites' personalty, the seizure of which, it argued, was beyond the scope of the District Court Order.

On the following day, May 15, 2009, Mr. White, *pro se*, filed a "Motion for Turnover of Personal Property" ("Mr. White's Turnover Motion") in the District Court Action seeking the return of both the Debtor's property and items of the Whites' personal property confiscated by Kittywalk and its agents during the May 12th seizure.

On May 18, 2009, this Court conducted a hearing on the Debtor's Turnover Motion and, citing 11 U.S.C. § 541(a) and U.S. v. Whiting Pools, Inc., 462 U.S. 198 (1983), ruled that any assets of the Debtor which were seized pursuant to the District Court Order remained property of the Debtor's estate notwithstanding the seizure.  The Court issued the First

6

Turnover Order which provided, in relevant part, the following:

> [T]he creditors [shall] *forthwith* turnover to the debtor all property of the debtor's bankruptcy estate in their possession and shall submit an accounting to debtor's counsel of the debtor's property which was seized pursuant to the order of the U.S. District Court within 7 days of the date of this order.

(emphasis added).  Neither Kittywalk nor the Kings sought or obtained an extension of time to comply with the Court's order.

Ten days later, on May 28, 2009, following a status conference in the District Court Action, Judge Tauro transferred the District Court Action to the Bankruptcy Court "for any further action that . . . [it] . . . deems appropriate." As a result of that order, the instant adversary proceeding was opened as a continuation of the District Court Action.

The District Court took no action on Mr. White's Turnover Motion prior to the transfer.  Kittywalk filed a response to that motion in which it represented, *inter alia*, that "[a]t no time did the Plaintiffs intentionally remove any personal items belonging to the Whites." The Kings admitted, however, that they did remove property from the Premises including "two (2) computers, associated monitors, business equipment and four (4) file boxes of business records which had been assembled by F.B.Rich & Sons and one (1) small office safe which remains locked and unopened[,]" all of which were described on an inventory list attached to the response.

On June 17, 2009, this Court conducted a hearing on Mr. White's Turnover Motion, which was supported by the affidavits of Mr. White, David A. Brega, a neighbor of the Whites, Donald W. White, Jr., Mr. White's brother, Christopher B. DeOrsay, a witness to

the seizure, and Mrs. White.  At the hearing, counsel to Kittywalk represented that all

property seized on May 12th had been returned to the Debtor and the Whites.  He

acknowledged, however, that Kittywalk and the Kings accessed the Debtor's computers

while they were in their possession, retaining copies of documents and electronic

information.  At the conclusion of the hearing, the Court issued the Second Turnover

Order, which provided the following:

> The plaintiff shall return any and all items and records, electronic or
> otherwise, *and all copies thereof*, seized from either the debtor or the principals
> of the debtor, and any and all electronic records, data, or information
> obtained from the computers of the debtor, its principals' office or residence
> *by 5:00 P.M. today*. The court enjoins the plaintiff from copying, reproducing,
> using, and/or disseminating any of the debtor's or its principal's records or
> documents.

(emphasis added).  Neither Kittywalk nor the Kings obtained an extension from the Court

of the 5:00 p.m. deadline.

The following day, June 18, 2009, Mr. White filed the Contempt Motion in which he

alleged that Kittywalk and the Kings continued to hold property in violation of this Court's

Turnover Orders.  Further, he alleged that the Kings also violated the District Court order

by personally removing property from the Premises on May 12th and transporting it to

their personal residence in New York. Additionally, he alleged that, as a result of the

seizure, certain proprietary information of the Debtor was in danger of falling into the

hands of third parties without its consent or authorization.  In his prayer for relief in the

Contempt Motion, Mr. White asked the Court to hold both Kittywalk and the Kings in

contempt, award appropriate sanctions and allow the "immediate search and seizure of

 . . . [the seized assets] . . . from the personal residence of [the Kings and the] place of

business of Kittywalk . . . ."

The Court conducted two hearings on the Contempt Motion, the first hearing took place in the morning of June 19, 2009, and the second hearing took place later that afternoon.  At the hearings, the parties advanced irreconcilable positions concerning the disposition of the property. Accordingly, the Court scheduled an evidentiary hearing on the Contempt Motion for June 22, 2009.

At the evidentiary hearing, Mr. White relied on his own testimony and that of Messrs. Brega and DeOrsay, Mrs. White and Mr. King.[3]   Kittywalk called only Mrs. King as a witness.  The parties introduced seven exhibits into evidence. Debtor's counsel appeared at the evidentiary hearing in support of the Contempt Motion, examined witnesses, made evidentiary objections, and in all respects represented the interests of the Debtor.

Upon consideration of the documentary and testimonial evidence introduced at trial, the arguments of counsel and the entire record of proceedings in this case, the Court now makes the following findings of fact and conclusions of law pursuant to Fed. R. Bankr. P. 7052.

---

[3] Mr. White called Mr. King as an adverse witness.

## III. FACTS

Messrs. Brega and DeOrsay witnessed the seizure of property from the Premises, and they testified about what they observed of the events which took place on May 12th. Mrs. White testified that she was not at home during the seizure.  Tr. at 32. Upon her return, she discovered that phones had been ripped out of walls and certain personal items were missing, including a leather briefcase belonging to Mr. White, which she testified was a gift to him, and two boxes containing two sets of a furniture accessory product called "Bed Boots" which she distributes and had set aside in the residence portion of the Premises to be mailed.  Tr. at 35-37. According to Mrs. White, those items have never been returned. Tr. at 38.

Mr. King identified himself as the owner of Kittywalk, a manufacturer and distributor of pet products, for whom the Debtor was a distributor from 2001 through 2005. Tr. at 67-68, 160.  Mr. King stated that on the morning of May 12, 2009, he entered both the residence and office portions of the Premises accompanied by both F.B. Rich employees and members of the United States Marshals Service.  Tr. at 83, 131.  He stated that he primarily restricted his activity to the office of the Debtor but entered and exited portions of the residence a few times for convenience. Tr. at 131. He testified that the Debtor's office contained thousands of documents and files and that "[w]e were given . . .  seventy minutes to take possession of an office that had probably 10,000 documents . . ." Tr. at 93. He conceded that he personally removed the telephone and computer systems and cut interwoven telephone and computer cable wires in order to do so. Tr. at 94-95.  He

summarized his assessment of which items to remove:

> When we got up to the office, it was a little perplexing because there was so much stuff, stuff on top of desks, computers, and finally, cabinets and heavy stuff and the safe.  For example, the safe, we didn't know if the safe contained Midnight Pass information or if it contained personal files.  We had no idea.  It was in the Midnight Pass office.  We thought it was an asset of Midnight Pass.  So very quickly we had to make a determination, and we made one . . . .  So with the movers' help we took into our car the computers, the towers, all of the paperwork that was on top of all of the desks and all of the filing cabinets.  We basically took possession of everything that *we thought was Midnight Pass.*

Tr. at 84-85 (emphasis supplied).

According to Mr. King, the Kings and the movers, F.B. Rich, removed the property from the Premises in two groups.  He testified that F.B. Rich removed about "three-quarters. . . or so" of the property seized.  Tr. at 115-116.  He stated that he "never laid eyes" on that property which was transported to F.B. Rich's warehouse.  Tr. at 116.  The Kings personally removed the remaining one-quarter of the items from the Premises, Tr. at 115,  placed them in their car and transported them to their personal residence in Port Washington, New York. Tr. at 101, 115.   These items consisted of a safe and "[c]omputers, monitors, all of the paperwork that . . . was left on top of the desks and filing cabinets. . . ." Tr. at 84-85 and 101.  According to Mr. King, these items were stored in his garage, and Mrs. King later prepared a detailed inventory of them. Tr. at 132-33.

With respect to the seized computers, Mr. King testified that on May 13, 2009, the day after the seizure, and the day after the Debtor had commenced its Chapter 11 case, he hired a Port Washington computer expert to pick up the computers at his home for the

11

purpose of accessing and copying the files contained on the hard drives.  Tr. at 70.  Mr.

King was asked about the specifics of the transfer:

> Q:  . . . you've already testified that with respect to the computer towers or terminals that you had taken, you did, in fact, make a copy of the hard drives, is that correct?
>
> A:  Yes, I gave it to this guy in Port Washington who took the [computer] towers and transported [them] to a silver hard drive. . .

Tr. at 133-134.

> Q:  And when you say he took them, what does that mean?
>
> A:  He picked them up, put them in the backseat of his car, and left,

Tr. at 70.

Later in the day on May 13th, the Kings received an email from the expert which

contained the Debtor's customer list.  Tr. at 77. After conferring with counsel, the Kings

emailed the Debtor's customers with an advertisement for Kittywalk, despite the Debtor's

bankruptcy filing the previous day. Tr. at 77-78.

Mr. King was asked what steps he took to comply with the First Turnover Order,

dated May 18, 2009, which required turnover of the Debtor's property to occur "forthwith."

He acknowledged that the Kings sent F.B. Rich a letter on May 20, 2009, two days after the

issuance of the Court's order, authorizing (but not directing) it to return the Debtor's

property.  Tr. at 117-118. The letter provided, in part:

> Kittywalk Systems, Inc. gives F.B. Rich permission to return the entire

12

contents of what F.B. Rich removed from the Midnight Pass office at 149 Old Main Street in Marshfield Hills on Tuesday May 12th under the supervision of the U.S. Marshall [sic] Service . . . Please make sure that Bradford White of Midnight Pass signs your inventory report acknowledging that what he is taking from your warehouse is the sum total of what you removed and placed in your van that morning. . . [W]e . . . give authorization for him to remove the inventory from your warehouse.

Defendant's Exhibit 3.

Mr. King testified that his efforts to comply with the First Turnover Order were "immediate" as he directed F.B. Rich to return the property it held on May 20th and made the property stored at his home available for inspection by the Whites' New York counsel, Lloyd Eisenberg, on May 21st. Tr. at 138-140. It was unclear from Mr. King's testimony, but it appears that Attorney Eisenberg picked up most of the items, excluding the safe, at the Kings' residence on May 23rd. Tr. at 76, 180. Delivery of the safe was delayed because the Kings believed it contained a loaded gun, and they wanted the police to facilitate the turnover to Mr. White. Tr. at 116, 123-24. Mr. White retrieved the safe from the Kings on May 26th in New York in the presence of local police. Tr. at 181-82. Mr. King maintained that he returned or caused to be returned all property held by him and F.B. Rich as expeditiously as he could following the issuance of the First Turnover Order. Tr. at 140. Despite the initial return, the Kings maintained copies of the Debtor's files on external hard drives, as well as copies of other documents relating to the Debtor, totaling approximately 150 pages which they thought were relevant to the business interests of Kittywalk. Tr. at 133-34.

Mr. White also questioned Mr. King about his compliance with the Second Turnover Order dated June 17, 2009, requiring the return of all copies of the Debtor's and the Whites' records by 5:00 p.m. on that date.  Mr. King testified that he did not ship those materials on June 17th, but instead sent them to Debtor's counsel via courier on the following day. The courier delivered the materials to counsel's office at noon on June 19th .  Tr. at 142-43. When asked why he did not deliver the items on June 17th, Mr. King explained that he was in very important business meetings until 3:30 p.m. that day and that "it simply wasn't feasible for me to drop everything on the chance that I could get home on time [during inclement weather], find where we put the photocopies, get the hard drive, and send it out that day."  Tr. at 149.  He added that, after conferring with counsel, he believed he was still "within keeping" of the order when he shipped the copies the next day because the Second Turnover Order did not appear on the Court's docket until June 18, 2009. Tr. at 119 and 143, 149. He maintained that it was always his intention to comply in good faith with the order and that he has returned every item of property, and all copies thereof, which was taken by the Kings or F.B. Rich from the Premises on May 12, 2009.  Tr. at 143-144.

Mr. White testified on his own behalf.  He described the business relationship between the Debtor and Kittywalk with whom it had done millions of dollars in business over the years. Tr. at 167.  According to Mr. White, the May 12th seizure was a result of the Debtor's inability to make payments to Kittywalk under the terms of the Settlement Agreement between the Debtor and Kittywalk which followed the issuance of the Judgment.  Tr. at 166-67.  Mr. White stated that the Kings warned him on March 5, 2009:

14

"No more waiting, we want our money now.  If not, we'll shut you down . . . we'll come after you with a vengeance[.]" Tr. at 167.

Mr. White also described the scene at the Debtor's office after the seizure. Telephones had been ripped from walls and many personal documents and items which were unrelated to the Debtor or its operations were removed. Tr. at 168. He added that several personal items had never been returned, including the briefcase described by Mrs. White which contained data and personal materials, the "Bed Boots," and flash drives containing "hundreds of critical passwords for family documents . . . ,  and pass codes to get into everything." Tr. at 169-170.  In his view, the confiscation of personal, business and other property unrelated to the Debtor amounted to theft.  Tr. at 171. When questioned about the value of the missing items, he stated:  "We're talking about $938 worth of products, and also about, could be a million dollars worth of proprietary loss . . . of information."  Tr. at 183.   He also testified about the property damage sustained during the seizure:

> Okay. So I came home . . . and the office was in shambles.  Phones, I witnessed ripped from the wall, computer sensitive cable, networks cut, $10,000 copier cables cut.  Basically things ripped from the wall, a 1977 graduation present of a Chelsea clock, which had nothing to do with Midnight Pass but ripped from the wall.  I mean ripped. I mean has to be rewired by a technician. [4]

Tr. at 168.

---

[4] Despite the $10,000 value attributed to the copier cables, Mr. White did not testify as to whether he replaced the items.

15

Notwithstanding his speculation about future losses, Mr. King did not quantify the amount of any damages he incurred for cleaning, repairing or replacing property as a result of the seizure other than with respect to the "Bed Boots" which belonged to his wife.

Mrs. King testified that she is the president of Kittywalk. Tr. at 204, 212. She stated that she did not observe the briefcase described by the Whites while she was at the Premises, that she never took it into her custody, and that she had no idea where it is. Tr. at 198, 201-202. Upon her return to New York, she indicated that she went through all items that she and her husband removed, sorted them out on tables arranged in her garage, and prepared an inventory of them. Tr. at 198-99. She maintained that all items were returned and that "there isn't anything in my house that has anything to do with Midnight Pass or Brad and Julie White." Tr. at 203-04.

With respect to the Second Turnover Order, she testified that she did nothing to comply with the order, adding that she did not assist her husband in complying with it because she was occupied "doing something else." Tr. at 203. She also added that the couple responded to this Court's turnover orders "as quickly as was possible for us." Tr. at 211.

**IV. DISCUSSION**

At issue in this matter are the alleged violations of the Orders by Kittywalk and its agents, the Kings, and the appropriate redress for any such violations. Due to the unusual procedural history of this matter, the Court must first address two threshold issues, namely Mr. White's standing to represent his wife and the Debtor, and, more importantly, this

16

Court's jurisdiction to enter the requested relief in favor of Mr. White.

A. <u>Standing</u>

Mr. White filed the Contempt Motion, *pro se*.  He was the sole signatory on the motion.   Both in the Contempt Motion and at trial, he purported to represent his own interests, as well as those of Mrs. White and, at times, the Debtor.   Because Mr. White is not a licensed attorney, however, the scope of his representation is circumscribed.  In <u>In re O'Connor</u>, No. 08-16434, 2009 WL 1616105 (Bankr. N.D. Ohio Feb. 27, 2009), the court explained:

> Section 1654 of Title 28 of the United States Code provides: "In all courts of the United States the parties may plead and conduct their own cases personally or by counsel. . . ." However, an individual's right to have a layperson conduct a case on the individual's behalf is limited by rules prohibiting the unauthorized practice of law. For example, a "venerable common law rule based on the strong state interest in regulating the practice of law" states that a non-lawyer layperson may *not* engage in the unauthorized practice of law by representing another person in court *pro se.*

2009 WL 1616105 at *3 (quoting <u>Cavanaugh v. Cardinal Local School District</u>, 409 F.3d 753, 756 (6th Cir.2005) (citations omitted) (abrogated on other grounds in <u>Winkelman v. Parma City School District</u>, 550 U.S. 516, 127 S. Ct. 1994, 167 L.Ed.2d 904 (2007)).

Mr. White is not an attorney and cannot perform legal services for others.  He may represent himself but cannot represent the interests of Mrs. White or the Debtor, who already is represented in this case by Attorney Shamban. *See also* Massachusetts Local Bankruptcy Rule 9010-1(c) which requires that corporations, partnerships and trusts shall appear only through counsel, with certain limited exceptions not applicable here.  Because

17

Mr. White can only represent himself, the Court shall consider the Contempt Motion to have been filed by Mr. White on his own behalf and will not consider any claims for sanctions or injunctive relief made therein or at trial on behalf of Mrs. White.  Because Mr. White also sought a finding of contempt against Kittywalk and the Kings and because they are alleged to have violated Court orders, the Court shall consider the evidentiary record with respect to the issue of contempt, particularly as the Debtor's rights and remedies are at stake and the Debtor, through its counsel, fully participated in the evidentiary hearing.

B. Jurisdiction

This adversary proceeding emanates from the Certification of Judgment filed by Kittywalk in the United States District Court for the District of Massachusetts. *See* 28 U.S.C. § 1963.[5]  Neither the Kings nor the Whites were parties to the Judgment.  Nonetheless, when the Judgment was certified and registered in the United States District Court for the

---

[5] Section 1963 provides, in pertinent part, the following:

> A judgment in an action for the recovery of money or property entered in any court of appeals, district court, bankruptcy court, or in the Court of International Trade may be registered by filing a certified copy of the judgment in any other district or, with respect to the Court of International Trade, in any judicial district, when the judgment has become final by appeal or expiration of the time for appeal or when ordered by the court that entered the judgment for good cause shown. . . . A judgment so registered shall have the same effect as a judgment of the district court of the district where registered and may be enforced in like manner.

28 U.S.C. § 1963.

District of Massachusetts, and an enforcement proceeding was thereby commenced, the Kings and the Whites were denominated as parties. When Judge Tauro transferred the District Court Action to this Court, the enforcement of the Judgment included disputes among parties who are neither debtors nor creditors of this bankruptcy estate.

The source of federal jurisdiction over bankruptcy cases and proceedings is 28 U.S.C. § 1334. That provision grants district courts original and exclusive jurisdiction over bankruptcy cases and original, but not exclusive jurisdiction over civil proceedings arising under or arising in or related to bankruptcy cases. 28 U.S.C. § 1334(a) and (b). Pursuant to 28 U.S.C. § 157(a), the district courts may refer to bankruptcy judges any or all bankruptcy cases and any or all proceedings arising under, arising in, or related to bankruptcy cases.[6] Bankruptcy judges may hear and determine "all cases under title 11 and all core proceedings arising under title 11, or arising in a case under title 11, referred under subsection (a) of this section, and may enter appropriate orders and judgments, subject to review under [28 U.S.C. § 158]." 28 U.S.C. § 157(b)(1).Core proceedings "include, but are not limited to– . . . (B) allowance or disallowance of claims against the estate . . . ." Section 157(b)(2)(B). Thus, this Court unequivocally has jurisdiction over Kittywalk's claim against the Debtor, but Mr. White's claim against the Kings is not a core matter.

---

[6] Rule 201 of the Local Rules of the District Court for the District of Massachusetts provides as follows:

> Pursuant to 28 U.S.C. § 157(a), any and all cases arising under Title 11 United States Code and any and all proceedings arising under Title 11 or arising in or related to a case under Title 11 shall be referred to the judges of the bankruptcy court for the District of Massachusetts.

Section 157(c)(1) provides that "[a] bankruptcy judge may hear a proceeding that is not a core proceeding but that is otherwise related to a case under title 11." 11 U.S.C. § 157(c). "In such proceeding, the bankruptcy judge shall submit proposed findings of fact and conclusions of law to the district court, and any final order or judgment shall be entered by the district judge after considering the bankruptcy judge's proposed findings and conclusions and after reviewing de novo those matters to which any party has timely and specifically objected." Id.

In Boston Regional Med. Center, Inc. v. Reynolds (In re Boston Regional Med. Center, Inc.), 410 F.3d 100 (1st Cir. 2005), the United States Court of Appeals for the First Circuit explained:

> The statutory grant of "related to" jurisdiction is quite broad. Congress deliberately allowed the cession of wide-ranging jurisdiction to the bankruptcy courts to enable them to deal efficiently and effectively with the entire universe of matters connected with bankruptcy estates. See Pacor, Inc. v. Higgins, 743 F.2d 984, 994 (3d Cir. 1984). Thus, bankruptcy courts ordinarily may exercise related to jurisdiction as long as the outcome of the litigation "potentially [could] have some effect on the bankruptcy estate, such as altering debtor's rights, liabilities, options, or freedom of action, or otherwise have an impact upon the handling and administration of the bankrupt estate." In re G.S.F. Corp., 938 F.2d 1467, 1475 (1st Cir. 1991) (quoting In re Smith, 866 F.2d 576, 580 (3d Cir. 1989)).

410 F.3d at 105.[7]

---

[7] The test for determining whether a civil proceeding is "related to" a bankruptcy case is "whether the *outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy . . .*" Pacor, Inc. v. Higgins, 743 F.2d 984, 994 ( 3d. Cir. 1984)(italics in Pacor ), *overruled on other grounds by* Things Remembered, Inc., v. Petrarca, 516 U.S. 124 (1995).

Because Kittywalk's Judgment against the Debtor involves a core matter, this Court has jurisdiction to enter dispositive orders involving disputes between Kittywalk and the Debtor as they relate to the allowance or disallowance of Kittywalk's claim against the estate.   *See* 28 U.S.C. § 157(b)(1)(2)(B). The same is true with respect to any disputes between the Debtor and the Kings, whose conduct, as agents of Kittywalk, could affect Kittywalk's claim against the Debtor arising out of the Judgment.

This Court's jurisdiction with respect to the separate dispute between Mr. White and the Kings is less clear, particularly as the matter was transferred to this Court by order of the U.S. District Court and was not originally filed in the Bankruptcy Court.   Mr. White's claim against the Kings could conceivably have an effect on the Debtor's case, albeit a remote, tenuous, and speculative one.   As will be discussed more fully below, because the Kings violated the Orders entered by this Court and the U.S. District Court, it is conceivable that the Debtor has claims against them in addition to those set forth by Mr. White in the Contempt Motion.   Were Mr. White to recover damages against the Kings, the ability of the Debtor to effectuate a recovery against them could be impaired.   Because this Court finds that Mr. White failed to sustain his burden with respect to the sanction and injunctive relief requests in the Contempt Motion, this Court need not traverse the very tenuous jurisdictional path set forth above.   Nevertheless, the Court observes that it has an additional jurisdictional grounds upon which to consider the Contempt Motion, namely the serious allegations raised by Mr. White concerning violations of this Court's orders, as well as an order of the U.S. District Court by agents of Kittywalk.   *See* <u>Travelers Indem. Co.</u>

v. Bailey, __ U.S. ___, 129 S. Ct. 2195, 2205 (2009)(A "bankruptcy court plainly ha[s]

jurisdiction to interpret and enforce its own prior orders.").

C. Contempt

The Bankruptcy Code contains no express contempt authority. Accordingly, the

extent and parameters within which Bankruptcy Courts may exercise contempt powers has

generated considerable discussion by courts and commentators. "Initially, there were

questions having to do, not only with whether the bankruptcy courts had [civil contempt]

power, but also with whether, if they did, the exercise of that power was constitutional.

However, most of these disputes are now a thing of the past." Hon. Nancy C. Dreher,

Bankruptcy Law Manual § 2A:23 (Thomson/West 5th ed. 2009)(footnotes omitted).  In

Bessette v. Avco Financial Services, Inc., 230 F.3d 439 (1st Cir. 2000), *cert. denied,* 532 U.S.

1048 (2001), the United States Court of Appeals for the First Circuit ruled that 11 U.S.C. §

105 "provides a bankruptcy court with statutory contempt powers, in addition to whatever

inherent contempt powers the court may have." Id. at 445.[8] *See also* Ameriquest Mortg. Co.

v. Nosek (In re Nosek), 544 F.3d 34, 43-44 (1st Cir. 2008)(citing Bessette). Other bankruptcy

---

[8] That statute provides, in relevant part, the following:

> (a) The court may issue any order, process, or judgment that is necessary
> or appropriate to carry out the provisions of this title. No provision of this
> title providing for the raising of an issue by a party in interest shall be
> construed to preclude the court from, sua sponte, taking any action or
> making any determination necessary or appropriate to enforce or
> implement court orders or rules, or to prevent an abuse of process.

courts have relied upon the court's inherent authority to find parties in contempt to enforce

orders.  For example, in <u>In re El Comandante Mgmt. Co., LLC</u>, 358 B.R. 1 (Bankr. D.P.R.

2006), the court stated:

> This Court adopts the definition of "inherent authority" by Professor Daniel
> J. Meador in *Inherent Judicial Authority in the Conduct of Civil Litigation*, Texas
> Law Review, June 1995; that is, "inherent authority" "means the authority of
> a trial court, whether state or federal, to control and direct the conduct of
> civil litigation without any express authorization in a constitution, statute,
> or written rule of court. This authority, in other words, flows from the
> powers possessed by a court simply because it is a court; it is an authority
> that inheres in the very nature of a judicial body and requires no grant of
> power other than that which creates the court and gives it jurisdiction." 73
> Tex. L.Rev. 1805.

<u>Id</u>. at 11 n.5.  Thus, this Court has the authority to remedy violations of its orders and to

enforce specific provisions of the Bankruptcy Code through its contempt power, whether

such power is inherent or conferred by 11 U.S.C. § 105.

Among the remedies available for violations of court orders, sanctions are employed

in civil contempt proceedings "to coerce the defendant into compliance with the court's

order or, where appropriate, to compensate the harmed party for losses sustained."  <u>Eck</u>

<u>v. Dodge Chemical Co. (In re Power Recovery Systems, Inc.)</u>, 950 F.2d 798, 802 (1st Cir.

1991)(citing <u>United States v. United Mine Workers</u>, 330 U.S. 258, 303-04 (1947)(footnotes

omitted)).  "These sanctions are not punitive, but purely remedial."  <u>Id</u>. (footnote omitted).

In contrast, criminal contempt sanctions "are punitive in their nature and are imposed for

the purpose of vindicating the authority of the court."  <u>Id</u>. at n.18 (citing <u>United Mine</u>

<u>Workers</u>, 330 U.S. at 302).  Said differently, "[i]f the primary purpose of the contempt

proceedings is to punish the defiance of a court's judicial authority through a fine or imprisonment, then the court is acting in a criminal contempt capacity." Dreher, Bankruptcy Law Manual, *supra,* at § 2A:23 (footnote omitted).

Some courts, including the United States Court of Appeals for the First Circuit, have suggested that punitive damages, normally the province of criminal contempt, are an available remedy under 11 U.S.C. § 105(a), *see* Bessette, 230 F.3d at 445 (stating that bankruptcy courts can use "their statutory contempt power to order monetary relief, in the form of actual damages, attorney fees, and punitive damages when creditors have engaged in conduct that violates [11 U.S.C.] § 524"); Jove Eng'g, Inc. v. I.R.S. (In re Jove Eng'g., Inc.), 92 F.3d 1539, 1554 (11th Cir. 1996) (stating "the plain meaning of § 105(a) encompasses *any* type of order, whether injunctive, compensatory or punitive, as long as it is 'necessary or appropriate' to carry out the provisions of the Code."); Fatsis v. Braunstein (In re Fatsis), 405 B.R. 1, 10 (B.A.P. 1st Cir. 2009)("Compensation for losses is not the only factor to be considered . . . because '[s]anctions stem, in part, from a need to regulate conduct during litigation.'")(quoting Goya Foods, Inc., v. Wallack Mgmt. Co., 344 F.3d 16, 19 (1st Cir, 2003));Wiley v. Mason (In re Wiley), 224 B.R. 58, 66 (Bankr. N.D. Ill. 1998) (stating that § 105(a) "authorizes the court to enter punitive damages. . . "), *vacated on other grounds on reconsideraton by* 237 B.R. 677 (Bankr. N.D. Ill. 1999); In re Latanowich, 207 B.R. 326, 334 (Bankr. D. Mass. 1997)("By its grant of authority to take any action necessary to enforce a court order, this Court also reads [§ 105] as authorizing punitive sanctions, which are simply another mechanism by which the court enforces its orders.")(citing Brown v.

Ramsay (In re Ragar), 3 F.3d 1174, 1179 (8th Cir.1993)).  A number of other courts, however, have consistently held that punitive damages are not available under a court's civil contempt powers.  Knupfer v. Lindblade (In re Dyer), 322 F.3d 1178, 1193 (9th Cir. 2003)("[C]riminal contempt sanctions are not available under § 105(a) . . . The sanctions associated with civil contempt-that is, compensatory damages, attorney fees, and the offending creditor's compliance-adequately meet [the] goal [of § 105], . . . rendering serious punitive sanctions unnecessary.")(citing Walls v. Wells Fargo Bank, N.A., 276 F.3d 502, 507 (9th Cir. 2002)); Matter of Terrebonne Fuel and Lube, Inc., 108 F.3d 609, 613 n.3 (5th Cir. 1997)("Although we find that bankruptcy judges can find a party in civil contempt, we must point out that bankruptcy courts lack the power to hold persons in criminal contempt.")(citing Griffith v. Oles (In re Hipp), 895 F.2d 1503, 1509 (5th Cir. 1990)); Armstrong v. Rushton (In re Armstrong), 304 B.R. 432, 438 (B.A.P. 10th Cir. 2004)(matters of criminal contempt sanctions for indirect criminal contempt that occur in the bankruptcy court shall be heard by the district court).  Moreover, criminal contempt is a "crime in the ordinary sense," Bloom v. Illinois, 391 U.S. 194, 201 (1968), and the exercise of judicial power to punish for criminal contempt is subject to the procedural safeguards that protect the criminally accused, Sosne v. Reinert & Duree, P.C. (In re Just Brakes Corporate Sys., Inc)., 108 F.3d 881, 885 (8th Cir. 1997), cert. denied, 118 S. Ct. 364 (1997), including proof beyond a reasonable doubt, all the protections afforded to those accused of a crime,  In re Power Recovery Systems, Inc., 950 F.2d at 802 n.18 (citing Fed. R. Crim. Pro. 42(b)), and the right to a jury trial in some circumstances.  See In re Armstrong, 304 B.R. at 438.

25

Although the First Circuit Court of Appeals in <u>Bessette</u> recognized that the contempt power of the bankruptcy court extends to awards of punitive damages, that decision was in the context of a violation of the statutorily imposed discharge injunction. *See* 11 U.S.C. § 524. Additionally, there appears to be a split among the circuits which have considered the question of whether bankruptcy courts have criminal contempt powers. *Compare* <u>Brown v. Ramsay (In re Ragar),</u> 3 F.3d 1174, 1179 (8th Cir. 1993)("An order of criminal contempt, no less than one of civil contempt, is necessary or appropriate to enforce the order for whose violation it is imposed, and the statute in pursuance of which that order was itself entered."), *with* <u>Griffith v. Oles (In re Hipp)</u>, 895 F.2d 1503, 1511 (5th Cir. 1990) ("[W]e hold that bankruptcy courts do not have inherent *criminal* contempt powers, at least with respect to the criminal contempts not committed in (or near) their presence." (emphasis in original)(footnote omitted)).

In view of the decisions cited above, this Court's authority to issue punitive damages is unsettled, especially where, as here, there is no specific Bankruptcy Code section which expressly empowers the Court to impose fines and punitive damages. *See, e.g.* 11 U.S.C.§§ 110(i) and (l)(authorizing fines against bankruptcy petition preparers), 303(i)(authorizing the debtor's recovery of punitive damages from any petitioner that filed a petition in bad faith), and 362(k)(authorizing punitive damages "in appropriate circumstances" for willful violation of the automatic stay). In the absence of direct guidance from the First Circuit defining the parameters of the Bankruptcy Court's ability to impose punitive sanctions against contemnors and the difficulties associated with

determining what procedural protections to accord them, this Court concludes that any remedy it may impose for contempt in this case is limited to remedial sanctions.

A party alleging civil contempt must establish by clear and convincing evidence that a contemnor violated a court order. AccuSoft Corp. v. Palo, 237 F.3d 31, 47 (1st Cir. 2001) (citation omitted). "[W]hile good-faith efforts alone do not insulate a defendant in a contempt action . . . our precedent permits a finding of contempt to be averted where diligent efforts result in substantial compliance with the underlying order." Id. (citing Star Fin. Servs., Inc. v. AASTAR Mortg. Corp., 89 F.3d 5, 10 (1st Cir. 1996) and Langton v. Johnston, 928 F.2d 1206, 1220 (1st Cir. 1996)). "In addition, contempt may only be established if the order allegedly violated is 'clear and unambiguous.'" Id. (citing Project B.A.S.I.C v. Kemp., 947 F. 2d 11, 16 (1st Cir. 1991)).

The Court must determine whether Kittywalk and its agents, the Kings, substantially complied with the First and Second Turnover Orders. Those orders are inextricably linked to the District Court Order, the execution of which prompted the Debtor's bankruptcy filing and necessitated the Turnover Orders to preserve property of the estate. Accordingly, the Court must also consider whether Kittywalk complied with that order. Based upon the clear and convincing evidence presented at trial, the Court finds that neither Kittywalk nor the Kings substantially complied with any of the three Orders.

The District Court Order was clear and contained strict parameters: the United States Marshals Service was permitted to seize only the Debtor's property which was to be

27

delivered to the third party Keeper, or to such other secured third party location as designated by Kittywalk, pending further order from the court.  There can be no dispute that Kittywalk and its agents, the Kings, exceeded the scope of the District Court Order when they seized the Whites' personal property on May 12th.  There is, however, insufficient evidence in the record for the Court to conclude that they did so intentionally given the condition of the Debtor's office and the time allotted to conduct the seizure.

The Kings' segregation and removal of selected items from the Premises which they personally transported to their home for closer inspection is a different matter.  The District Court Order did not authorize Kittywalk or its agents to hold or control any of the Debtor's property separately from the Keeper or permit its transfer to the Kings' personal residence. Indeed, the order, which was issued on an *ex parte* basis, explicitly provided that the security of the assets was to be preserved pending the issuance of a further court order. Based upon a review of the language of the District Court Order, it appears to have been carefully crafted to prevent the very situation presented here, namely allegations of loss and damages resulting from Kittywalk's access to the Debtor's property at an insecure third party location, the Kings' home.  This is especially the case with respect to the Debtor's most crucial asset, its computer hard drives, which Mr. King permitted an unrelated third party to access and copy without any restrictions or protections.  The information on those drives, including the Debtor's customer list, is presumably still accessible by the Kings and third parties and is unprotected.  The effect of this conduct on the bankruptcy estate and the Debtor's ability to reorganize is presently unknown.

28

With respect to the First Turnover Order, Mr. King testified that he and his New York counsel began an "immediate dialogue" about the return of the Debtor's property after the entry of the order on May 18, 2009. Kittywalk, however, did not authorize F.B. Rich to release the Debtor's property it held until May 20th, two days after the entry of the First Turnover Order. Mr. King made the property stored at his home available for inspection by the Whites' New York counsel for the first time on May 21st and several meetings had to occur before Mr. White was able to retrieve the last items on May 26th. While the Kings may have had legitimate concerns regarding the storage of weapons in the safe, they should have brought their concerns to the attention of this Court and sought an extension of time to comply with the First Turnover Order. Further, the Kings' motives in continuing to retain a copy of the hard drives after the issuance of the First Turnover Order, especially in light of their postpetition appropriation of the Debtor's customer list which may have constituted a violation of the automatic stay, are suspect. *See* 11 U.S.C. § 362(a)(3).[9] A prompt and substantial response is required following the issuance of a

---

[9] The statute provides, in part:

> (a) . . . a petition filed under section 301, 302, or 303 of this title, . . . operates as a stay, applicable to all entities, of–
>
> > (3) any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate;

11 U.S.C. § 362(a)(3).

turnover order to avoid any diminution in the value of the estate.  Kittywalk's compliance efforts were neither diligent nor substantial.   On the contrary, they were slow and piecemeal.

The Second Turnover Order required Kittywalk to return any and all remaining items and records, and all copies thereof, of the Debtor and its principals by 5:00 p.m. on June 17, 2009. Despite the deadline, the copied documents and hard drives were not mailed by Mr. King until the following day.  Mr. King represented that he was unable to leave work, travel home, and send the materials in time to meet the 5:00 p.m. deadline.   He testified that he was working a substantial distance from his home where the copies were stored and that weather conditions would have lengthened his travel time.  Mrs. King, however, had no such excuse.  She personally took part in the seizure, transported items from the Premises in her car and was responsible for inventorying everything taken.  Yet, she took no action to comply with the Second Turnover Order and reported that she "was doing something else."  As the president and agent of Kittywalk, Mrs. King was obligated to comply with the turnover order.  She failed to demonstrate any effort to do so.  Indeed, her conduct reflects an overt indifference to the authority of this Court.

All of the Orders were clear and unambiguous, and neither Kittywalk nor the Kings alleged uncertainties about the efforts required by them to comply with the Orders.  The Court finds that they did not make diligent efforts that resulted in substantial compliance with any of the three Orders. Indeed, Kittywalk and the Kings violated not only the language but the spirit of those Orders which were all intended to preserve the Debtor's

property pending further proceedings in the District Court or this Court.

Having found that Kittywalk and the Kings violated the Orders, the Court must determine the appropriate remedy. If this Court's authority to impose punitive sanctions for past conduct stood on firmer ground, this would be an appropriate case in which to award them. The Kings' prepetition conduct was characterized by vengeful disregard and destruction of property, and their postpetition conduct was marked by a pattern of defiance of court orders and the judicial process. Nonetheless, they testified that they have now returned all property owned by the Debtor and the Whites. The Court finds that they have complied with the Orders, albeit in an untimely fashion and after multiple court proceedings. Accordingly, there is no need for the entry of any coercive or deterrent orders against Kittywalk to assure prospective conduct in light of the return of the Debtor's property. Thus, the Court shall consider only compensatory damages.

The Court is without adequate information at this time to determine the extent of the Debtor's damages suffered as a result of the conduct of the Kings and Kittywalk. Indeed, the effect on the Debtor's estate is likely still unknown, especially with regard to its customer list. The Court, therefore, will defer the imposition of compensatory damages until such time as the Debtor files an appropriate pleading to redress any injury to it caused by Kittywalk and its agents. The Court may then also consider whether equitable subordination of Kittywalk's claim under 11 U.S.C. § 510(c) should be employed to compensate the Debtor for Kittywalk's inequitable conduct and harm to the estate. Additionally, the Debtor may have other causes of action which it can prosecute at the

appropriate time.

As discussed above, the Court's "related-to" jurisdiction to resolve the dispute between the Whites and the Kings is so tenuous and speculative that it is unlikely it would withstand scrutiny under the <u>Pacor</u> test.   Thus, this Court concludes that it lacks jurisdiction to award sanctions or provide injunctive relief to Mr. White.   Even if it were to conclude otherwise, however, Mr. White neither requested nor quantified damages in the Contempt Motion or at trial.   He merely proffered speculation about potential future losses.   In the event that he can prove damages against the Kings in the future, the Court's decision is intended to be without prejudice to his ability to seek relief in an appropriate nonbankruptcy forum.

## V. CONCLUSION

For all of the above stated reasons and because of this Court's inherent authority and jurisdiction to enforce its own orders, the Court finds that Kittywalk and its agents, the Kings, are in civil contempt for violating each of the Orders as they pertain to the Debtor. In any subsequent proceeding within this case, they shall be collaterally estopped from challenging this finding.   The Debtor, however, has not as yet filed an appropriate pleading seeking an award damages for those violations or the violation of the automatic stay. For the above reasons, the Court denies Mr. White's Contempt Motion with respect to the request for sanctions and injunctive relief.   The Court allows the Contempt Motion only to

the extent he seeks an order holding Kittywalk and the Kings in contempt for violation of

the Orders.

By the Court,

Joan N. Feeney

Joan N. Feeney
United States Bankruptcy Judge

Dated: October 30, 2009

cc: G. Shepard Bingham, Esq., Bradford D. White; Stephen E. Shamban, Esq., U.S.
Trustee